UNITED STATES OF AMERICA      :
                              :
      v.                      :      No. 2:04-CR-156
                              :
JEFFREY CRAIG                 :


## OPINION and ORDER

Defendant Jeffrey Craig is charged with four counts of
possessing a firearm in or affecting commerce as an unlawful user
of a controlled substance, in violation of 18 U.S.C. § 922(g)(3);
one count of receiving a firearm that has been shipped or
transported in interstate commerce while under indictment for a
crime punishable by imprisonment for a term exceeding one year,
in violation of 18 U.S.C. §§ 922(n) and 924(a)(1)(D); and one
count of possessing a firearm in or affecting commerce as a
fugitive from justice, in violation of 18 U.S.C. § 922(g)(2).[1]
Craig filed a Motion to Suppress Evidence and to Dismiss (Docs.
15, 27) based on three separate encounters with law enforcement
officials between September 2002 and January 2008.  The Court
held hearings on this motion on October 2 and 10, 2008, and the
parties filed supplemental post-hearing briefs on November 10,

---

[1] On January 15, 2009, the government filed a six-count
second superseding indictment.  This indictment contains a new
count charging Craig with knowingly possessing a firearm in
furtherance of a drug trafficking crime in violation of 18 U.S.C.
§ 924(c)(1)(A); the remaining five counts are substantially
similar to those contained in the superseding indictment.  On
January 27, 2009, Craig was arraigned and pled not guilty to all
six counts of the second superseding indictment.

2008.  Based on the evidence submitted by the parties and the arguments of counsel, the Court issues the following opinion.

## DISCUSSION

This case stems from three separate events: (1) Craig's detention at a concert site in Wilmington, Vermont on September 1, 2002; (2) interviews of Craig by Alcohol, Tobacco, & Firearms ("ATF") agents conducted in Burlington, Vermont on September 20 and 23, 2002; and (3) Craig's detention by Burlington police officers at the City Market in Burlington on January 25, 2008. Since these are factually distinct situations, the Court addresses each separately.

## A.   The September 2002 Concert

**Factual Background**

The Strangefolk-Garden of Eden Music Festival (the "Concert") took place at Haystack Mountain in Wilmington, Vermont from August 31 to September 2, 2002.  This was an outdoor concert venue with a stage and areas set aside for camping and parking. The Concert promoter hired Green Mountain Concert Security ("GMC Security") and the Rutland County Sheriff's Department ("Rutland Sheriffs") to provide security during the Concert.  GMC Security patrolled the area in front of the stage and the vendor areas, and searched cars as they entered the venue.  The Rutland

Sheriffs patrolled the area in back of the stage, the parking and camping areas, the main gate and ticketing area, and the areas along the access roads. Rutland Sheriffs were present at the entrance area but did not participate in the vehicle searches. The Rutland Sheriffs and GMC Security had separate command posts, but they were in radio communication. They also had an agreement that if a person troubled GMC Security, GMC Security would bring that person to the Rutland Sheriffs, who would eject or arrest the person, or take other steps as necessary.

At approximately 8 p.m. on August 31, 2002 Craig entered the Concert venue in a white jeep. At the main entrance security checkpoint, GMC Security officers searched Craig's jeep and found what appeared to be illegal mushrooms in the jeep. When the officers removed the mushrooms and disposed of them, Craig became agitated and gave the security officers a hard time. Ryan Wheeler, a GMC Security officer, approached Craig and asked him to leave the Concert. Later that evening, Wheeler obtained approval from the production staff to remove Craig, but GMC Security could not locate Craig that evening. The next morning, September 1, 2002, at approximately 10 a.m., Wheeler and Kevin Cheney, the owner of GMC Security, saw Craig's jeep in an area where it was not allowed to be parked. Wheeler and Cheney then encountered Craig and advised him that he was going to be removed from the Concert grounds. Wheeler and Cheney did not physically

restrain Craig, but called the Rutland Sheriffs to escort Craig off the property. The Rutland Sheriffs did not ask Wheeler and Cheney to detain Craig until they arrived.

In response to Wheeler's call at approximately 10:30 a.m. on September 1, 2002, Sergeant William Skeens and Deputy Kim Hunter were dispatched to the area where Craig's jeep was parked. When Skeens and Hunter arrived, GMC Security officers were speaking with Craig near the jeep, and Hunter observed a portable lamppost behind the jeep, blocking Craig in. Craig told the two GMC Security officers, Wheeler and Cheney, and the two Rutland Sheriffs, Skeens and Hunter, that he wanted the lamppost removed so he could leave, but there is no evidence that Craig said this to the GMC Security officers before Skeens and Hunter arrived. The GMC Security officers told Skeens and Hunter that they wanted Craig removed from the Concert grounds because he had been out of control the previous night. Skeens approached Craig while Hunter talked to the GMC Security officers. After Skeens introduced himself to Craig and they shook hands, Craig identified himself and told Skeens that he had been a real jerk the previous night, but was OK now.

As Skeens talked to Craig, he noticed a slight odor of marijuana coming from Craig. Skeens observed Craig patting his bulging pants pockets in a manner that made Skeens suspect that he was hiding something; Hunter also noticed Craig's bulky pants.

Skeens told Craig that with his years of experience, he believed that Craig possessed an illegal substance, and he requested that Craig turn it over to him if he did.  Craig removed from his pants pockets 21 baggies containing what appeared to be marijuana.  Skeens estimated that approximately five minutes elapsed between the time he arrived and Craig emptied his pants pockets.

Skeens asked Craig to go to the command post with him. Craig agreed, and rode with Skeens and Hunter in their police cruiser to the command post.  Skeens entered the command post while Craig stood outside.  At least one other deputy was outside keeping an eye on Craig and would have stopped him from leaving. Skeens began the paperwork to charge Craig with possession of marijuana, but Captain Steve Benard, who was in the command post, suggested obtaining consent to search Craig's jeep.  Skeens showed Craig the consent card and explained that Craig did not have to sign it.  Craig asked what would happen if he didn't sign it, and Skeens replied that he would get a search warrant and search the car.  Craig signed the consent card, and Hunter, along with two other officers, went to Craig's jeep and searched the interior.  The officers did not find anything in the interior of the car.  Lifting the interior door coverings, the officers found empty plastic bags and a scale.  The officers asked Craig if they could continue the search in the area of the command post.  Craig

agreed, gave them the keys, and the jeep was moved to the command post.  Craig told the officers that the jeep contained approximately two pounds of marijuana and a pistol.  After searching, the officers found four sealed plastic bags containing approximately two and a half pounds of marijuana, a loaded Glock .45 caliber automatic pistol, and $2548.00 in cash.  Craig also had $1393.00 in cash in his wallet.

Throughout this encounter, Skeens noted that Craig was polite and cooperative, spoke freely about the marijuana, and told Skeens that he sells marijuana at concerts.

**Analysis**

Craig contends that GMC Security officers acted as agents of the Rutland Sheriffs and illegally detained him on September 1, 2002.  As a result, Craig seeks to suppress the items seized from him and the statements he made that day.

The government is prohibited from conducting "unreasonable searches and seizures."  U.S. Const. amend. IV.  "[A] wrongful search or seizure conducted by a private party does not violate the Fourth Amendment and [] such private wrongdoing does not deprive the government of the right to use evidence that it has acquired lawfully."  *United States v. Walter,* 447 U.S. 649, 656 (1980) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 487-490 (1971)).  "However, where a private party acts as an 'instrument or agent' of the state in effecting a search or seizure, fourth

amendment interests are implicated." *Walther v. United States*, 652 F.2d 788, 791 (9th Cir. 1981) (citing *Coolidge*, 403 U.S. at 487); *accord United States v. Bennett*, 709 F.2d 803, 805 (2d Cir. 1983); *United States v. Shahid*, 117 F.3d 322, 325 (7th Cir. 1997).

> [D]e minimis or incidental contacts between the citizen and law enforcement agents prior to or during the course of a search or seizure will not subject the search to fourth amendment scrutiny. The government must be involved either directly as a participant or indirectly as an encourager of the private citizen's actions before we deem the citizen to be an instrument of the state. The requisite degree of governmental participation involves some degree of knowledge and acquiescence in the search.

*Walther*, 652 F.2d at 791-92 (citations omitted).

Two critical factors to determine whether a private party acts as an 'instrument or agent' of the government are: (1) the government's knowledge and acquiescence in the search or seizure; and (2) the intent of the party performing the search or seizure. *Walther*, 652 F.2d at 792; *see also Bennett,* 709 F.2d at 805 ("[a] private person cannot act unilaterally as an agent or instrument of the state; there must be some degree of governmental knowledge and acquiescence.") (citations omitted). "Other useful criteria are whether the private actor acted at the request of the government and whether the government offered the private actor a reward." *Shahid*, 117 F.3d at 325 (citations omitted).

7

To determine whether GMC Security acted as an instrument or agent of the government, the Court first considers whether the Rutland Sheriffs knew of or acquiesced in GMC Security's detention of Craig. As part of coordinating security for the Concert, there was an understanding or agreement that any person troubling GMC Security would be brought to the Rutland Sheriffs for further action, such as removal from the Concert or arrest. Arguably, the Rutland Sheriffs were on notice and aware that GMC Security might be detaining and bringing people to the Rutland Sheriffs. And that is exactly what occurred in this case. GMC Security officers advised Craig that he was going to be removed by the Rutland Sheriffs and blocked his jeep with a portable lamppost, making it impossible for him to leave. Skeens and Hunter were summoned to remove Craig from the Concert grounds, and although they did not ask GMC Security to handcuff or physically restrain Craig, Craig was prevented from leaving until they arrived. When Skeens and Hunter arrived, Craig asked the GMC Security officers, Wheeler and Cheney, and the Rutland Sheriffs, Skeens and Hunter, to remove the lamppost so he could leave, but there is no evidence that Craig asked the GMC Security officers whether he could leave before the Rutland Sheriffs arrived. Based on these facts, the Court finds that the Rutland Sheriffs knew of and acquiesced in GMC Security's detention of Craig.

This is not the end of the inquiry, however. The Court must also consider GMC Security's intent in detaining Craig. At the time of the incident, Wheeler stated that he "held [Craig] until he could be escorted off property by the Rutland County Sheriffs." Def.'s Ex. D, Wheeler Statement, Sept. 1, 2002. In an interview conducted on September 26, 2008, Wheeler reiterated that he "advised Craig he was going to remove him from the property" and he "contacted the Rutland County Sheriff's Officers and requested they assist Craig from the property." Govt.'s Ex. 16, Report of Investigation, Sept. 26, 2008. Cheney stated that after seeing Craig's jeep parked in an improper area, he "requested assistance from Rutland County Sheriff Officers who were patrolling in the area in removing Craig from the venue property." Govt.'s Ex. 17, Report of Investigation, Oct. 1, 2002. Skeens also reported that GMC Security called the Rutland Sheriffs to request "that [Craig] be removed today because of his behavior last nite [sic] and in not wanting to have anymore problems today resulting in the same type [of] behavior." Def.'s Ex. K, Skeens Affidavit, Sept. 1, 2002.

This makes clear that GMC Security's intent in holding Craig was to have him removed from the Concert grounds. There is no evidence that GMC Security intended to detain Craig on suspicion of criminal behavior. There is also no evidence that GMC Security acted at the request of the Rutland Sheriffs. In

fact, the evidence shows exactly the opposite – GMC Security requested the Rutland Sheriffs' assistance.

Similarly, there is no evidence that the Rutland Sheriffs offered or gave GMC Security any kind of reward for detaining Craig. These facts resemble those in *United States v. Abney*, where an off-duty police officer working as a private security guard questioned a person suspected of using counterfeit money and asked him to empty his pockets. The private security guard was not wearing a police uniform, identified himself as a security guard, and did not arrest, pat down, or physically restrain the suspect. The private security guard also testified that he acted to further the security interests of the private store in not receiving counterfeit notes. In those circumstances, the court determined that the private security guard was not acting as an agent or instrument of the government. *United States v. Abney*, No. 03 CR 60(JGK) 2003 WL 22047842 at *5-*6 (S.D.N.Y. Aug. 29, 2003).

Like the security guard in *Abney*, GMC Security officers testified that they were acting to protect the interests of their employer, the Concert promoter, by avoiding any problems or confrontations at the Concert.[2] The evidence here falls short

---

[2] Craig suggests that the facts here are similar to those in *United States v. Couch*, 378 F. Supp. 2d 50 (N.D.N.Y. 2005) and *United States v. Barth*, 26 F. Supp. 2d 929 (W.D. Tex. 1998), but these cases are easily distinguished. In *Couch*, the court found that a police officer called to assist private individuals

of establishing that GMC Security acted as an instrument or agent of the government.  Since the Fourth Amendment does not apply to private party action, there is no constitutional violation.

Craig also contends that the Rutland Sheriffs' continued detention of him violated his constitutional rights.  This contention is not supported by the evidence.  When Skeens and Hunter arrived at the place where Craig's jeep was parked and Craig was speaking to GMC Security officers, Skeens approached Craig and began speaking with him.  Craig admitted that he had been a real jerk the night before.  Skeens noticed the odor of marijuana coming from Craig and that Craig was patting his bulky pants pockets, as if he were hiding something.  Based on his years of experience, Skeens told Craig that he believed that Craig possessed an illegal substance, and Skeens requested that Craig turn it over to him if he did.  Craig removed 21 bags of marijuana from his pants pockets.  According to Skeens,

---

with a drug search was acting as a police officer; he was in full uniform, armed with a firearm and handcuffs, and he completed a police reporting form documenting the search. *Couch*, 378 F. Supp. 2d at 58-61.  *Barth* involved a private computer technician's search of a computer hard drive that contained child pornography.  While the initial search by the technician was legal, the court determined that a broader search conducted at the request of government officials violated the defendant's Fourth Amendment rights.  *Barth*, 26 F. Supp. 2d at 936-38.  In contrast, GMC Security officers asked for government assistance to remove Craig in order to avoid a disturbance at the Concert, and they did not act at the request or direction of the government.

approximately five minutes passed between the time he began speaking with Craig and when Craig emptied his pockets. Based on Skeen's observations, there was reasonable suspicion that Craig had been or was going to be engaging in criminal activity and his brief detention was permissible to further the investigation.[3]

Craig's motion to suppress evidence and statements obtained from him as a result of his detention and search at the Concert is **denied**.

## B.   The September 2002 ATF Interviews

**Factual Background**

After Craig's detention and search at the Concert, on September 3, 2002 Craig was arraigned in Vermont district court and pled not guilty to a state felony charge of possessing marijuana. At the arraignment, Craig was assigned a public defender and on September 10, 2002, a private attorney entered his appearance to represent Craig on the state charge.

On September 20, 2002, ATF agents James Martin, Daniel McPartlin and Matthew Ekstrom went to Craig's residence in Burlington to investigate his possession of a firearm. The

---

[3] It is unclear whether Craig challenges the search of his vehicle, but assuming that he does, the Court finds that he voluntarily consented to the search of his jeep. *See* Govt.'s Opp. (Doc. 34), Ex. 3 (consent to search form). There is no evidence to suggest that Craig did not act voluntarily.

agents asked the person who answered the door (an "unidentified male") if Craig or Lori Demaine, Craig's girlfriend, lived there. The unidentified male stated that they did, and asked the agents to wait. A few minutes later, Craig appeared at the door and the agents told him that they wanted to interview Demaine. Martin says that he detected the odor of marijuana on Craig's breath and observed that Craig's pupils were constricted and bloodshot. Craig told Martin that Demaine was in the bedroom, and Martin told Craig that he believed that Craig was under the influence of a controlled substance. Craig said that he had just smoked marijuana.

Martin asked Craig whether there were any firearms in the residence. Craig said that there was an AK-47 assault rifle, a loaded 12 gauge pistol-gripped shotgun, and that he had loaned a handgun to a friend. After Craig freely consented to a search for the firearms, he directed Martin to where the AK-47 and shotgun were stored. The agents seized the firearms. The agents also asked Craig if there was marijuana or other narcotics in the house. Craig retrieved a glass jar containing marijuana and gave it to the agents.

On September 23, 2002, ATF agents Martin, Ekstrom, David Campbell and Tom Jusianiec returned to Craig's residence. The unidentified male answered the door, Martin asked for Craig, and Craig came to the door shortly thereafter. Martin told Craig

that he was not under arrest or required to speak to the agents, but Craig said that he wanted to clarify some issues. Craig explained that after meeting with the agents on September 20, 2002, Craig and Demaine retrieved a Walther PPK pistol from a storage unit on Shelburne Road that Craig shared with Ronnie Ghaffari. Craig and Demaine took the Walther pistol to a second storage unit that Craig leased on Pine Street in Burlington. Craig offered to accompany the agents to the Pine Street storage unit. Martin and Jusianiec took Craig to the storage unit, Craig signed a consent to search form, opened the storage unit and pointed to a paper bag. The paper bag contained a Walther PPK handgun, which the agents seized.

As Martin, Jusianiec and Craig returned to Craig's residence, Craig told the agents that he had just smoked marijuana and that this was going to be his last time because he hoped to enter rehabilitation.

**Analysis**

Craig advances two reasons for suppressing the evidence obtained as a result of these interviews: (1) the interviews arose out of Craig's illegal detention at the Concert on September 1, 2002 so any evidence seized is "fruit of the poisonous tree;" and (2) these interviews violated Craig's Sixth Amendment right to counsel. In light of the Court's ruling that Craig's detention at the Concert was not unconstitutional, the

Court denies Craig's first argument.  Assuming that the information Craig provided in these interviews was not given voluntarily, but was a product of government interrogation, the Court addresses Craig's Sixth Amendment argument.

"In all criminal prosecutions, the accused shall . . . have the assistance of counsel for his defence."  U.S. Const. amend. VI.

> The Sixth Amendment right, however, is offense specific.  It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, "at or after the initiation of adversary judicial criminal proceedings - whether by way of formal charge, preliminary hearing, indictment, information, or arraignment."

*McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991) (quotations omitted).  "[O]nce this right to counsel has attached and has been invoked, any subsequent waiver during a police-initiated custodial interview is ineffective."  *Id.*  Since the Sixth Amendment right to counsel attaches only to charged offenses, "it does encompass offenses that, even if not formally charged, would be considered the same offense under the *Blockburger* test." *Texas v. Cobb*, 532 U.S. 162, 173 (2001).  Under *Blockburger*, "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."  *See Blockburger v. United States,* 284 U.S. 299, 304

(1932).

Under *McNeil* and *Cobb*, Craig's Sixth Amendment right to counsel attached after he was charged in Vermont state court with felony possession of marijuana. Since the Sixth Amendment right is "offense-specific," it only precludes the government from interviewing Craig about the drug possession charge. The ATF interviews, however, focused on firearms. At the time of the ATF interviews, Craig was not arrested and he was not charged with any federal drug or firearms offenses. Years later, in 2004, Craig was indicted in federal court and pled not guilty to four counts of possessing a firearm in or affecting commerce as an unlawful user of a controlled substance, in violation of 18 U.S.C. § 922(g)(3). Craig has not been charged with any federal offense for possessing or selling marijuana.

Under the *Blockburger* test, the facts needed to prove the Vermont state charge of possessing marijuana differ from those required to prove the federal offense of possessing a firearm as an unlawful user of a controlled substance. The state charge requires proving that Craig knowingly possessed one pound or more of marijuana. *See* Vt. Stat. Ann. tit. 18, § 4230(a)(3) (2008). The federal firearms offense requires proving that Craig was an addict or unlawful user of controlled substances; Craig knowingly possessed a firearm; and that the firearm traveled in interstate commerce prior to Craig's possession of it. Because these

16

offenses require proof of different facts, they do not meet the *Blockburger* test for similar offenses to which Craig's Sixth Amendment right of counsel attached. The ATF interviews did not violate Craig's Sixth Amendment right to counsel that attached to his state felony possession of marijuana charge.

Craig's motion to suppress evidence obtained through the ATF interviews is therefore **denied**.


## C.    Craig's Detention at City Market

**Factual Background**

On January 25, 2008, Corporal Small of the Burlington Police Department heard on his radio a "be on the lookout" for a male with two rifles walking in the area of College Street and South Winooski Avenue in downtown Burlington. The male was described as wearing camouflage and dark pants. Small drove to the area and while turning from Bank Street onto South Winooski Avenue, he saw a man wearing a plaid coat (of the type that a hunter might wear) and dark blue jeans. The man was not carrying rifles, but Small believed that this man fairly fit the description of the subject of the "be on the lookout" bulletin. The man was walking from the general area of College Street and South Winooski Avenue towards City Market, a store on South Winooski Avenue. As Small drove near the man, he yelled at the man to stop, but the man ignored him and continued walking into City Market. The man was

17

listening to earphones.

Small followed the man into City Market and caught up to him in the wine section of the store. Small identified himself and asked the man if he was carrying any weapons. The man replied that he had a pistol and a knife. Small removed a Glock pistol from the man and told him that he was not in trouble for having the gun and the knife. The pistol was unchambered with a full magazine, and the man had another full magazine with him, which Small also removed. Small explained that he followed the man and needed to speak to him because of a citizen complaint of a male matching his description who was reported as carrying weapons in public.

The man identified himself as Jeffrey Douglas, with a date of birth of May 5, 1976. The only form of identification that Douglas had with him was a YMCA member card. Small contacted dispatch to run a records check on the name Jeffrey Douglas, but no records were found. Trying to confirm Douglas's identity, Small then asked Douglas whether he had ever had a Vermont driver's license, to which Douglas said yes. Small ran another records check, including a check of motor vehicle records, and still nothing was found matching Douglas's name and date of birth. Small told Douglas that he would release him once his identity could be confirmed, but that he was under investigative detention.

During Small's exchange with Douglas, two other police officers arrived, Sergeant Lewis and Lieutenant Ward. Small testified that this took place within minutes of when Small called in his location. When Lewis and Ward arrived, they informed Small that the "be on the lookout" had been resolved (the "suspect" turned out to be J. Chris Frappier, an investigator with the Chittenden County Public Defender's Office who was lawfully moving two rifles between his car and his College Street office). Small says that the officers became suspicious that Douglas was hiding something when they realized that he was not being truthful about having a Vermont driver's license and the officers could not verify Douglas's identity. As the officers continued to question Douglas, he eventually said that he wanted to speak with an attorney. At about the same time, the manager of City Market asked whether the officers and Douglas wanted to move into an office upstairs for privacy, to which Douglas agreed. Douglas began trying to contact attorneys while the officers contacted other agencies to try to confirm Douglas's identity. Lewis eventually spoke with ATF agent Joseph Steele, who agreed to come to City Market.

When Steele arrived, approximately one hour and forty minutes after Small first encountered Douglas, Steele and Douglas appeared to recognize each other. Douglas then provided the officers with his actual name, Jeffrey Craig. A records check

showed that Craig had two outstanding warrants in Vermont for his arrest.  When taken into custody, in addition to the pistol, magazines, and knife, Small removed $955.00 from Craig.

**Analysis**

As a result of his extended detention at City Market, Craig moves to suppress all of the evidence seized from him and statements that he made.[4]  Craig suggests that Small had a lawful basis to briefly detain him under *Terry*, but that his continued detention was illegal once the officers learned that the "be on the lookout" had been resolved.  Craig argues that once it was discovered that he was not the person carrying the rifles, the police should have allowed him to leave because he had not broken the law and presented no threat to the public.

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the [g]overnment, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest."  *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)).  "Under *Terry*, a police officer may briefly detain an individual for questioning if the officer has 'a reasonable suspicion that the

---

[4] At the hearing on this motion, there was some discussion about suppressing the ATF agent's identification of Craig, but Craig is not moving to suppress this identification.  Nor could he.  A defendant's identity cannot be suppressed under the exclusionary rule.  *See, e.g., I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1039-40 (1984).

individual is, has been, or is about to be engaged in criminal activity.'" *United States v. Padilla*, 548 F.3d 179, 186 (2d Cir. 2008) (citation omitted). "[P]ermissible investigative measures in the context of a *Terry* stop consist of questioning (which may include a request for identification or inquiry concerning the suspicious conduct of the person detained); communication with police or private citizens to verify explanations, confirm identification, or determine whether a person of the proffered identity is otherwise wanted." *United States v. Askew*, 529 F.3d 1119, 1136 (D.C. Cir. 2008) (citing *Michigan v. Summers*, 452 U.S. 692, 700 n.12 (1981)); *see also Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt County*, 542 U.S. 177, 186 (2004) ("[Q]uestions concerning a suspect's identity are a routine and accepted part of many *Terry* stops.").

After stopping Craig to ask him if he had any weapons (based on the "be on the lookout" bulletin) and recovering a loaded gun from him, Small asked Craig for his name and date of birth so he could release him. The officers' inability to verify Craig's identity justified his detention after the "be on the lookout" had been resolved. The officers asked Craig various questions to try to confirm his identity. Rather than providing clarification, Craig provided responses that could not be verified. After Craig told the officers that he had a Vermont driver's license and a records check found no matching records

for a Jeffrey Douglas, the officers knew that Craig was not being truthful. Craig's responses raised the officers' suspicions that he was not the person he claimed to be.

Craig makes much of the fact that he had not broken any state or local law and that Vermont law allows a person to carry a firearm, but federal law places limits on who may carry a firearm. For example, it is unlawful for persons convicted of a crime punishable by more than one year in prison, fugitives from justice, users of unlawful drugs, and persons convicted of a misdemeanor crime of domestic violence to possess a firearm. *See* 18 U.S.C. §§ 922(g)(1), (2), (3), (9). Without verification of Craig's identity, the officers could not confirm that Craig was lawfully carrying a loaded firearm. Indeed, Small testified that where a person is carrying a weapon, "the standard procedure is to identify somebody because if we [police officers] are making contact with them, we don't want to end up releasing somebody who turned up to be an escaped felon or some – or who had some type of warrant of some sort." Hrg. Tr. 54:23-55:9, Oct. 10, 2008.

The facts of this case justify Craig's continued detention for approximately one and a half hours. His detention was not unreasonably prolonged. The length of Craig's detention was directly related to the delay caused by Craig's untruthful responses and the time it took the officers to verify his identity. "The somewhat longer detention was simply the result

of a 'graduate[d]. . . respons[e] to the demands of [the] particular situation.'" *United States v. Sharpe*, 470 U.S. 675, 688 (1985) (rejecting challenge to investigatory stop "when the police have acted diligently and a suspect's actions contribute to the added delay about which he complains.")(citation omitted).

Accordingly, Craig's motion to suppress any statements or evidence obtained as a result of his detention at City Market is **denied**.

### ORDER

For the foregoing reasons, the Court **denies** Craig's Motion to Suppress Evidence and to Dismiss (Docs. 15, 27) in its entirety.

Dated at Burlington, Vermont this 4th day of February, 2009.


/s/ William K. Sessions III_____
William K. Sessions III
Chief Judge, U.S. District Court